UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

HAROLD D. WASHINGTON,       )
                           )
          Plaintiff,       )
                           )
     v.                    )     No.  4:05CV1073 ERW
                           )                    (FRB)
JO ANNE B. BARNHART,       )
Commissioner of Social Security, )
                           )
          Defendant.       )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal for review of an adverse determination by the Social Security Administration. All pretrial matters were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) for appropriate disposition.

**I. Procedural History**

On July 28, 2003, plaintiff Harold Demond Washington filed an application for Disability Insurance Benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq., and an application for Supplemental Security Income pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq., in which he claimed he became disabled on February 15, 2003. (Tr. 39-41, 163-64.) On initial consideration, the Social Security Administration denied Plaintiff's claims for benefits. (Tr. 24-28.) On August 16, 2004, a hearing was held before an

- 1 -

Administrative Law Judge (ALJ).  (Tr. 169-96.)  Plaintiff testified and was represented by counsel.  On November 12, 2004, the ALJ issued a decision denying Plaintiff's claims for benefits.  (Tr. 11-19.)  On May 16, 2005, the Appeals Council denied Plaintiff's request for review of the ALJ's decision.  (Tr. 5-8.)  The ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

At the hearing on August 16, 2004, Plaintiff testified in response to questions posed by the ALJ and counsel.  Plaintiff is thirty years of age.  Plaintiff stands six feet, four inches tall and weighs 430 pounds.  (Tr. 173.)  Plaintiff testified that his normal weight is 300 pounds.  (Tr. 174.)  Plaintiff graduated from high school and attended a community college but did not obtain a degree therefrom.  (Tr. 174-75.)  Plaintiff has lived alone in his home for over three years.  (Tr. 174.)

Plaintiff testified that he last worked as a security officer at Barnes-Jewish Hospital and also worked as a personal bodyguard for entertainers visiting St. Louis.  (Tr. 175.)  When he was younger, Plaintiff worked in fast food restaurants.  (Tr. 176.)

Plaintiff testified that he slipped on ice in February 2003 which caused him to fall and injure both legs.  (Tr. 176.)  Plaintiff testified that he drove himself home after the incident and that his mother called an ambulance, but that the paramedics

did not transport him to a hospital telling Plaintiff that he probably sustained only bruises. Plaintiff testified that he eventually went to St. Louis University Hospital and was advised that he probably had bruised tendons. Plaintiff testified that he thereafter went to another hospital for a second opinion but was given the same diagnosis. (Tr. 177.) Plaintiff testified that he returned to St. Louis University Hospital because of his continued inability to stand and was advised by another physician that the quadriceps muscles in both legs were torn. (Tr. 177-78.)

Plaintiff testified that he first participated in physical therapy for the condition and then ultimately underwent surgery in September 2003 for the muscle tear in his right leg after which he underwent additional physical therapy for approximately one year for strengthening and mobility. (Tr. 178-80.) Plaintiff testified that it was determined that surgery would first be performed on the right leg and then eventually on the left leg once the right leg had recovered to provide support. (Tr. 178.) Plaintiff testified that it was subsequently learned that there continued to be a tear in the right leg, but that it was determined that surgery would proceed on the left leg and that the right leg would be worked upon again after the left leg became strong. (Tr. 180.) Plaintiff testified that just two weeks prior to the hearing, surgery had finally been performed on his left leg. (Tr. 180, 183.) Plaintiff testified that his doctor provided no information as to how long it would take for his condition to heal.

(Tr. 184.) Plaintiff testified that he was scheduled for a follow up appointment with his surgeon within the current week and that he would learn at that time what subsequent treatment and/or action would be taken with regard to the left leg. (Tr. 181-82.) Plaintiff testified that at some point, he will require additional surgery on the right leg. (Tr. 184.)

Plaintiff testified that he was currently experiencing pain in his upper thigh and in his knee but that he had no pain before the surgery. (Tr. 184.) Plaintiff testified that prior to surgery, his leg would buckle and give way due to the torn muscle, causing him to fall. Plaintiff testified that he had fallen on three occasions. (Tr. 185.) Plaintiff testified that between the time of the accident in February 2003 and his first surgery in September 2003, he used a wheelchair during his doctor visits and therapy sessions but did not have a wheelchair to use at home. (Tr. 185-86.) Plaintiff testified that he used crutches for seven or eight months subsequent to the September 2003 surgery and was again on crutches currently because of his recent surgery on the left leg. (Tr. 186-87.) Plaintiff testified that he takes antibiotics and was prescribed pain medication after his second surgery, which he needed to refill inasmuch as he had taken all of it. (Tr. 188, 194.) Plaintiff testified that he was previously prescribed pain medication after his first surgery as well. (Tr. 194.) The ALJ noted that Plaintiff stood throughout the hearing, to which Plaintiff responded that he was experiencing pain while he

was sitting prior to the start of the hearing.  Plaintiff testified that he sat around a lot during the period immediately after he fell but that after the second surgery, it hurt more to sit.  (Tr. 189-90.)  Plaintiff testified that his doctor instructed him to elevate his leg when he sits.  (Tr. 190.)

Plaintiff testified that his mother sometimes comes to his home to help with housework, that he has tried to sweep while sitting and scooting in a chair, and that he must sit in a chair when retrieving food items from his icebox.  Plaintiff testified that he does not cook and that his sister goes to the store for him. (Tr. 189.)  Plaintiff testified that he does not drive.  (Tr. 191.)  Plaintiff testified that he uses his upper body strength to get in and out of bed by himself.  Plaintiff testified that he currently has disturbed sleep because of the pain and the cast. (Tr. 192.)

Plaintiff testified that he gained 130 pounds during the previous eighteen months because he has been unable to exercise as he wished (Tr. 174) and also because he was probably eating too much (Tr. 192-93).

### III.  Medical Records

Plaintiff was admitted to the emergency department at St. Louis University Hospital on February 9, 2003, and reported that he had recently fallen on some ice, wrenching and landing on both knees.  Plaintiff complained of pain in the knee joints and above

both knees and reported that he was unable to bear weight. (Tr. 84, 86.) Plaintiff reported that alcohol baths and heat packs provided no relief. Ecchymosis and edema was noted about both knees but with no gross deformity. Tenderness was noted proximal to the knees. (Tr. 84.) Plaintiff had full range of motion with no laxity. Plaintiff experienced increased pain with standing and was unable to extend his legs bilaterally. (Tr. 86.) X-rays taken of both knees were unremarkable and showed no fracture. (Tr. 89.) Plaintiff was diagnosed with knee strain and was given Toradol.[1] Plaintiff was instructed to take ibuprofen, to use crutches and to apply ice to his knees. (Tr. 84.)

Plaintiff returned to the emergency department at St. Louis University Hospital on July 3, 2003, complaining of increased pain in both knees, with the pain in his right knee worse than in the left. Plaintiff reported that he had been unable to walk without experiencing pain since his fall in February 2003. Plaintiff described his pain at a level three or four on a scale of one to ten. (Tr. 78.) It was noted that Plaintiff was taking no medication. (Tr. 82.) Physical examination showed Plaintiff to have full range of motion of the left knee and to be able to extend the knee against resistance. Plaintiff was unable to extend the right knee and positive quadriceps deficit was noted. Plaintiff

---

[1]Toradol is indicated for the short-term management of moderately severe acute pain that requires analgesia at the opioid level. Physicians' Desk Reference 2789-91 (55th ed. 2001).

was diagnosed with chronic rupture of the quadriceps tendon on the right and was instructed to follow up with an orthopaedist. (Tr. 81.) Plaintiff was given an immobilizer for his right knee and was instructed to use crutches as needed. (Tr. 75, 79, 81.)

Plaintiff visited the Department of Orthopaedic Surgery Department at SLUCare on July 11, 2003. Plaintiff's relevant medical history was noted and Plaintiff complained of continued pain since his fall and that he has had difficulty walking, with his right knee giving out on occasion. Dr. David Noll noted that Plaintiff took no medications. Plaintiff's obesity was noted. Physical examination showed Plaintiff's left knee to be stable, with full range of motion and no deformities. Strength was measured to be 5/5 with sensation noted to be intact. Plaintiff's right knee showed no ligamentous instability and had full range of motion. Extension was noted to be 4/5. Dr. Noll diagnosed Plaintiff with partial tear of the right quadriceps tendon and an MRI was ordered of the right knee. Plaintiff was instructed to participate in physical therapy for strengthening and range of motion, and to return in two months for follow up. (Tr. 105, 106-07.)

On September 8, 2003, a non-examining, non-treating medical consultant for Disability Determinations completed a residual functional capacity (RFC) checklist assessment in which it was opined, inter alia, that Plaintiff could stand and/or walk for a total of about six hours in an eight-hour workday; sit for a

total of about six hours in an eight-hour workday; had unlimited ability to push and/or pull including operation of foot controls; and could frequently climb, balance, stoop, kneel, crouch, and crawl. (Tr. 109-16.)

Plaintiff returned to Dr. Noll on September 10, 2003, who noted Plaintiff to be in a wheelchair. Plaintiff reported that he has been unable to walk under his own power since sustaining the injury. Dr. Noll noted the MRI not to have yet been taken, but that Plaintiff had been participating in physical therapy. Upon physical examination, Dr. Noll diagnosed Plaintiff with right quadriceps tendon rupture and suspected left partial quadriceps tendon rupture. Plaintiff was instructed to continue with physical therapy and to undergo an MRI. (Tr. 153.)

An MRI of Plaintiff's right knee taken on September 17, 2003, showed a complete tear of the distal quadriceps tendon with surrounding fluid. An MRI of the left knee showed a partial tear of the distal quadriceps tendon. (Tr. 148-51.)

Dr. David Kieffer from the Department of Orthopaedic Surgery at St. Louis University examined Plaintiff on September 17, 2003, and noted that physical examination and MRI results showed bilateral quadriceps rupture. Dr. Kieffer determined for Plaintiff to undergo quadriceps reconstruction in the right knee to be followed in the left knee. Dr. Kieffer explained to Plaintiff that "this might amount to six months to a year of surgery, rehab, and convalescence." (Tr. 152.)

Plaintiff was admitted to St. Louis University Hospital on September 25, 2003, to undergo surgery to reconstruct the quadriceps tendon in the right thigh. Plaintiff experienced post-operative pain for which he was given Percocet[2] and Oxycontin.[3] Plaintiff was discharged on October 1, 2003. (Tr. 120-25.)

Plaintiff returned to Dr. Kieffer on October 9, 2003, for follow up of his surgery. Dr. Kieffer noted Plaintiff to have close to thirty degrees of passive range and active extension to zero degrees. Dr. Kieffer determined to start Plaintiff on active assistive exercises. Plaintiff was prescribed Duricef[4] and was instructed to return in two weeks. (Tr. 146, 147.)

Plaintiff returned to Dr. Kieffer on October 23, 2003, who noted Plaintiff to have eighty to ninety degrees of active and passive range of the knee, with no swelling. Dr. Kieffer instructed Plaintiff to continue in crutch-assisted walking and to continue active range and active assisted range and gait training. Plaintiff was prescribed Darvocet[5] and was instructed to return in

---

[2]Percocet is indicated for the relief of moderate to moderately severe pain. Physicians' Desk Reference 1211 (55th ed. 2001).

[3]Oxycontin is indicated for the management of moderate to severe pain where use of an opioid analgesic is appropriate for more than a few days. Physicians' Desk Reference, 2697-98 (55th ed. 2001).

[4]Duricef is an antibiotic used for the treatment of infections. Physicians' Desk Reference 1003-04 (55th ed. 2001).

[5]Darvocet is indicated for the relief of mild to moderate pain. Physicians' Desk Reference 1708-09 (55th ed. 2001).

two weeks. (Tr. 145, 146.)

On November 13, 2003, Plaintiff visited Dr. Kieffer who noted Plaintiff to have ninety to 100 degrees of flexion and minus two degrees of extension. Dr. Kieffer determined that Plaintiff would proceed to progressive resistance exercise and should wean himself off of the crutches. Plaintiff was instructed to return in three weeks. (Tr. 143.)

Plaintiff visited Dr. Kieffer on December 4, 2003, who placed Plaintiff on "advanced supervised return." Plaintiff was instructed to proceed to a cane and to return for continued follow up in three weeks. (Tr. 142.)

Plaintiff returned to Dr. Kieffer on January 19, 2004, who noted Plaintiff to have minus five to ten degrees of extension and to have full flexion. Dr. Kieffer noted Plaintiff to have improved half of his original extension deficit. No other instabilities or swelling were noted. Dr. Kieffer instructed Plaintiff to report to therapy for advanced supervised training. It was recommended that Plaintiff start weight training lifts, treadmill work, continue to refine his gait, and wean himself from crutches. Plaintiff was instructed to return in one month. (Tr. 141.)

On February 19, 2004, Dr. Kieffer noted Plaintiff to continue to have a minus two to three degree extension lag. Plaintiff was instructed to wean himself from crutches and to continue strengthening. Dr. Kieffer instructed Plaintiff to return

in one month.  It was noted that reconstruction of the left quadriceps was to be considered.  (Tr. 140.)

On April 5, 2004, Dr. Kieffer noted Plaintiff to continue to have a ten-degree extension lag.  A palpable defect was noted in the central portion of the repair.  Dr. Kieffer noted Plaintiff to be extending less than ten pounds and that he was currently on 200 pounds of leg press.  Dr. Kieffer instructed Plaintiff to return to the gym and attempt to achieve forty-five to fifty pounds of isolated extension and 300 to 400 pounds of press.  Dr. Kieffer opined that if Plaintiff's strength increased and the extension lag could be reduced, revision surgery may not be considered.  Dr. Kieffer indicated that such consideration nevertheless would be made prior to surgery on the left leg.  Plaintiff was instructed to return on a monthly basis.  (Tr. 139.)

Plaintiff returned to Dr. Kieffer on July 12, 2004, for a preoperative assessment of the left knee/thigh.  Dr. Kieffer noted that surgery would be scheduled to repair the left quadriceps rupture.  Dr. Kieffer noted that he was "going to continue to follow [Plaintiff's] right postop for months" and that revision of the repair of the right quadriceps may need to be considered.  (Tr. 136.)

An MRI of the right knee taken July 14, 2004, showed a re-tear of the quadriceps tendon.  (Tr. 135.)  Upon review of this MRI, Dr. Kieffer informed Plaintiff that he was now currently considering a revision of the right quadriceps repair or a primary

repair of the left quadriceps rupture, and instructed Plaintiff to select the knee for which surgery would be scheduled.  (Tr. 134.)

On August 5, 2004, Plaintiff underwent surgery at St. Louis University Hospital to reconstruct the left quadriceps.  (Tr. 131-32.)  Plaintiff was discharged August 8, 2004, at which time it was noted that Plaintiff's pain was controlled and that physical therapy was "going adequately."  (Tr. 128.)  Percocet and Keflex[6] were prescribed for Plaintiff upon discharge.  (Tr. 126.)

Plaintiff followed up with Dr. Kieffer on August 12, 2004, who noted the cast to have been removed.  Dr. Kieffer diagnosed Plaintiff with quadriceps rupture, right knee; and delayed quadriceps rupture, left knee.  Plaintiff was placed back into a cylinder cast and was instructed to bear full weight.  Dr. Kieffer instructed Plaintiff to hold on the physical therapy but to return to the clinic in one week.  (Tr. 162.)

Plaintiff visited Dr. Kieffer on August 19, 2004, who indicated that Plaintiff was "two weeks status post revision of quadriceps tension rupture, right."[7]  Dr. Kieffer diagnosed

---

[6]Keflex is indicated in the treatment of skin infections. Physicians' Desk Reference 1124 (55th ed. 2001).

[7]As set out above, the hospital records and Plaintiff's hearing testimony show that the surgical procedure for which Plaintiff was status-post in August 2004 was primary repair of the left quadriceps muscle rather than revision of the right quadriceps rupture.  The record is unclear as to why Dr. Kieffer refers to Plaintiff having undergone revision on the right when no other evidence demonstrates such surgical procedure to have been performed.

Plaintiff with status-post revision of quadriceps tendon rupture, right knee; and delayed quadriceps rupture, left knee. The cast was removed and Plaintiff was placed in an immobilizer. Plaintiff was instructed to return in one week. (Tr. 161.)

In a written memorandum dated August 19, 2004, Dr. Kieffer indicated that, for work activities, Plaintiff was 100% restricted. (Tr. 159.)

Plaintiff returned to Dr. Kieffer on August 30, 2004, who indicated that Plaintiff was "two weeks status post revision of quadriceps tendon rupture, right and is doing well."[8] Dr. Kieffer noted Plaintiff to have ninety degrees of flexion and minus two to three degrees of extension. Dr. Kieffer diagnosed Plaintiff with status-post revision of quadriceps tendon rupture, right knee; and delayed quadriceps rupture, left knee. Plaintiff was instructed to now start "catching release" and to continue splinting and walking. Plaintiff was to continue to protect active range only. (Tr. 160.)

## IV.  The ALJ's Decision

The ALJ found that Plaintiff met the disability insured status requirements of the Social Security Act and was insured for benefits through the date of the decision. The ALJ also found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability. The ALJ found Plaintiff's knee and leg injuries to be severe but that they did not meet or

---

[8]See supra note 7.

medically equal an impairment listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ also found that Plaintiff had retained full use of his upper extremities, including good use of his hands and fingers, and that he presently did not have the ability to stand or walk for six hours. The ALJ found Plaintiff unable to perform his past relevant work. The ALJ determined Plaintiff to have the RFC to perform sedentary work. Considering Plaintiff's age, education, work experience, and exertional capacity for a wide range of sedentary work, the ALJ determined Medical-Vocational Rule 201.27 to direct a finding of not disabled. The ALJ thus found Plaintiff not to be under a disability at any time through the date of the decision. (Tr. 18.)

## V. Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, Plaintiff must prove that he is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared

disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes

entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001).

To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the plaintiff's impairments.

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

<u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts

from the Commissioner's decision.  Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).  However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence.  Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068(8th Cir. 2000)).  A Commissioner's decision may not be reversed merely because substantial evidence also exists that would support a contrary outcome.  Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole and, specifically, that the ALJ erred in his determination that Plaintiff had the RFC to perform work inasmuch as the ALJ failed to properly consider the opinion of Plaintiff's treating physician and failed to fully and fairly develop the record.  Plaintiff also contends that the ALJ failed to properly consider Plaintiff's subjective complaints and did not articulate any reason to discredit Plaintiff's testimony of disabling symptoms.

A.   Credibility Determination

Before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility.  Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).  In determining the credibility of a claimant's subjective complaints, the ALJ must consider all evidence relating to the complaints, including the claimant's prior work record and third party observations as to the claimant's daily

activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). Although the ALJ may not discount subjective complaints on the sole basis of personal observation, he may disbelieve a claimant's complaints if there are inconsistencies in the evidence as a whole. Id.

When, on judicial review, a plaintiff contends that the ALJ failed to properly consider his subjective complaints, "the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints . . . under the Polaski standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." Masterson v. Barnhart, 363 F.3d 731, 738-39 (8th Cir. 2004). It is not enough that the record merely contain inconsistencies. Instead, the ALJ must specifically demonstrate in his decision that he considered all of the evidence. Id. at 738; see also Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991). Where an ALJ explicitly considers the Polaski factors but then discredits a claimant's complaints for good reason, the decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). The determination of a claimant's credibility is for the Commissioner, and not the Court, to make. Tellez, 403 F.3d at

957; <u>Pearsall</u>, 274 F.3d at 1218.

In this cause, the ALJ did not specifically invoke <u>Polaski</u> by name but nevertheless considered the factors identified in <u>Polaski</u> when he assessed Plaintiff's credibility, that is, Plaintiff's daily activities; the duration, frequency and intensity of Plaintiff's symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of Plaintiff's medication; and any functional restrictions. (Tr. 16-17.) The ALJ found that Plaintiff's reconstructive surgery certainly "suggest[ed that] many of his subjective complaints are credible," finding it reasonable to expect that Plaintiff would have difficulty walking and increased levels of pain and discomfort "in the short term[.]" (Tr. 16.) However, the ALJ appeared generally to discredit Plaintiff's complaints, stating:

> However, while the claimant's significant leg injuries and surgical recovery have caused setbacks, the evidence suggests he completes routine daily activities, maintains his own selfcare, and drives himself to medical appointments and rehabilitation therapy. While he has been understandingly depressed about his circumstances, his medical treatment was successful and it is reasonable to assume that, with continued compliance with prescribed treatment, he will recover his capacity for normal mobility and walking.
>
> The claimant's complaints of pain are noted, as is his need for a knee immobilizer, and the use of crutches for walking. Clearly the claimant does not presently retain the ability to stand or walk for 6 hours in a day. However, the evidence shows the use of medications has been effective in controlling

his pain. Reports from treating physicians indicate he is doing well following his recent surgery. Recent surgical wounds have healed, the cast has been removed, and he has been placed back in the knee immobilizer. He has been advised to "continue walking," "to bear full weight," and "continue to protect active range only". No side effects from pain medications have been reported.

(Tr. 16-17.) (Citation omitted.)

A review of the record on the whole shows these alleged inconsistencies found by the ALJ not to be supported by substantial evidence.

First, without identifying any activities in which Plaintiff engages, the ALJ cursorily states that the Plaintiff "completes routine daily activities." There is no evidence in the record to support this finding. Indeed, the evidence supports a contrary finding. In a Disability Questionnaire completed by Plaintiff on August 7, 2003, Plaintiff reported that, at that time, he was unable to do laundry, dishes, make a bed, iron, vacuum or sweep, take out trash, home repairs, car maintenance, lawn care, banking, or go the post office. (Tr. 65.) Plaintiff reported in the Questionnaire that he engages in no shopping, prepares microwave meals, and must lie down to put on his clothes. Plaintiff reported his daily activities to be taking a bath upon waking, eating something, and then watching television or reading. (Tr. 66.) Plaintiff reported in the Questionnaire that he was able to drive but that he had been advised by the Rehabilitation Center

not to drive because of his injuries.  Plaintiff reported that he was able to leave his home but did not often do so.  (Tr. 67.)  At the administrative hearing conducted one year later on August 14, 2004, Plaintiff testified that his mother helps with the housework, that he attempts to do some housework while sitting and scooting in a chair, that he does not shop, and that all he does basically is sit.  Plaintiff testified that he no longer drives and must keep his leg elevated when he sits.  (Tr. 189-91.)  This evidence, the only evidence in the record regarding Plaintiff's daily activities, does not support a finding that Plaintiff is able to complete "routine daily activities."  See Reed v. Barnhart, 399 F.3d 917, 922-23 (8th Cir. 2005); Cline, 939 F.2d at 565-66 (uncontradicted evidence of claimant's daily activities establishes pattern of restricted activity consistent with claims of disabling conditions).

In addition, the ALJ's finding that Plaintiff drives himself to medical and physical therapy appointments has less than substantial support in the record.  Plaintiff reported in his August 2003 Questionnaire that he was then currently able to drive but did not indicate to where he drives, how often or for what distance.  Although he responded that he traveled to the Rehabilitation Center, it is unclear from this response whether Plaintiff drove himself to the Center or merely considered it a "trip" he takes as asked in the question.  (Tr. 67.)  In addition, Plaintiff indicated in the Questionnaire that he was advised by the

Center not to drive because of his injury and indeed testified at the hearing in August 2004 that he no longer drives. (Tr. 67, 191.) The ALJ failed to acknowledge this evidence in his credibility determination, however. Given the medical evidence of Plaintiff's unimproved condition since completing the Questionnaire in August 2003, instruction by Plaintiff's treatment providers not to drive, and Plaintiff's testimony that he currently does not drive, it cannot be said that ambiguous answers given in a Disability Questionnaire completed one year prior to the administrative hearing constitute substantial evidence upon which the ALJ could rely in discrediting Plaintiff's complaints of current disabling conditions. See Frankl v. Shalala, 47 F.3d 935, 938 (8th Cir. 1995) (ALJ must look to claimant's subjective complaints and evidence of RFC at time of the hearing).

In addition, the ALJ's finding that Plaintiff's medical treatment had been successful is contrary to the medical evidence of record which shows that six months subsequent to surgical reconstruction of the right quadriceps muscle, a palpable defect was noted in the central portion of the repair and that, at the time of the hearing, additional surgery was required but had not yet been performed to repair the re-tear of the muscle. Frankl, 47 F.3d at 938. Finally, while the ALJ noted in his credibility determination that Plaintiff's pain was controlled with medication and that Plaintiff suffered no side effects from such medication, cf. Gulliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005)

(evidence of effective medication resulting in relief may diminish the credibility of a claimant's complaints), these factors do not weigh heavily in determining Plaintiff's credibility in this cause inasmuch as Plaintiff did not claim that pain prevented him from engaging in any activity but rather that he is restricted by his instability and immobility. See Burress v. Apfel, 141 F.3d 875, 881 (8th Cir. 1998) (to the extent an inconsistency may exist, it does not rise to the level of substantial evidence on the record as a whole sufficient to discount claimant's testimony).

In light of the above, it cannot be said that the ALJ demonstrated in his written decision that he considered all of the evidence relevant to Plaintiff's complaints or that the evidence he considered so contradicted Plaintiff's subjective complaints that Plaintiff's testimony could be discounted as not credible. Masterson, 363 F.3d at 738-39. Indeed, the alleged inconsistencies upon which the ALJ relied to discredit Plaintiff's subjective complaints are not supported by, and in some instances are contrary to, the record. Such discrepancies undermine the ALJ's ultimate conclusion that Plaintiff's symptoms are less severe than he claims. Baumgarten v. Chater, 75 F.3d 366, 368-69 (8th Cir. 1996). As such, it cannot be said that the ALJ's adverse credibility determination is supported by substantial evidence on the record as a whole.

Accordingly, because the ALJ's decision fails to demonstrate that the ALJ considered all of the evidence before him

under the standards set out in _Polaski_, this cause should be remanded to the Commissioner for an appropriate analysis of Plaintiff's credibility in the manner required by and for the reasons discussed in _Polaski_.

B.   Residual Functional Capacity

Plaintiff claims that the ALJ erred in his determination that he retained the RFC to perform work inasmuch as the ALJ failed to properly consider the opinion of Plaintiff's treating physician and failed to fully and fairly develop the record.  For the following reasons, Plaintiff's argument is well taken.

Residual functional capacity is what a claimant can do despite his limitations.  _Dunahoo v. Apfel_, 241 F.3d 1033, 1039 (8th Cir. 2001).  The ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations.  _Goff v. Barnhart_, 421 F.3d 785, 793 (8th Cir. 2005); 20 C.F.R. §§ 404.1545(a), 416.945(a).  A claimant's RFC is a medical question, however, and some medical evidence must support the ALJ's RFC determination.  _Hutsell v. Massanari_, 259 F.3d 707, 711-12 (8th Cir. 2001); _Lauer v. Apfel_, 245 F.3d 700, 703-04 (8th Cir. 2001).  The ALJ is "required to consider at least some supporting evidence from a [medical professional]" and should therefore obtain medical evidence that addresses the claimant's ability to function in the workplace.

Hutsell, 259 F.3d at 712 (internal quotation marks and citation omitted).  An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand.  Id.  An RFC checklist completed by a non-treating, non-examining physician who has merely reviewed reports is not *medical* evidence as to how the claimant's impairments affect his current ability to function and thus cannot alone constitute substantial evidence to support an ALJ's RFC assessment.  See Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000); Nunn v. Heckler, 732 F.2d 645, 649 (8th Cir. 1984).

In this cause, the ALJ found Plaintiff able to perform the full range of sedentary work.[9]  In making this determination, the ALJ found that Plaintiff retained the full use of his upper extremities, including good use of his hands and fingers.  The ALJ further found that Plaintiff did not presently have the ability to stand or walk for six hours but that "claimant's hope (and ours) is that his inability to get around comfortably is temporary and that, with further recovery he will retain the ability to walk or stand

---

[9]     Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a).

for longer periods." (Tr. 17.) The ALJ determined it "reasonable to assume that, with continued compliance with prescribed treatment, he will recover his capacity for normal mobility and walking." (Tr. 16.) Because this finding is not supported by medical evidence in the record, the ALJ's RFC determination cannot stand.

Although the ALJ found that Plaintiff could not stand or walk for six hours, no medical evidence in the record addresses the Plaintiff's ability to stand and/or walk for any period of time and the extent to which Plaintiff may need to alternate between sitting and standing during an eight-hour workday. Nor does any medical evidence support the ALJ's assumption and hope that Plaintiff will recover his capacity for normal mobility and walking or provide a time frame within which such normal mobility could be attained. Indeed, a finding of non-disability based upon an ALJ's assumptions and hope cannot be said to be supported by substantial evidence inasmuch as an ALJ may not draw upon his own inferences from medical reports in reaching his decision. <u>Nevland</u>, 204 F.3d at 857. Nevertheless, the medical evidence in the record appears to run counter to the ALJ's assumptions.

There is ample medical evidence in the record demonstrating that from the time of his fall in February 2003 through the date of the hearing in August 2004, Plaintiff experienced significant restrictions which limited his ability to walk without assistance, ultimately requiring reconstructive

surgery which proved unsuccessful.  In September 2003, Plaintiff's treating physician, Dr. Kieffer, advised Plaintiff that treatment for his injuries "might amount to six months to a year of surgery, rehab, and convalescence." (Tr. 152.)  In April 2004, Dr. Kieffer determined there to be a defect in the surgical repair of the right quadriceps muscle.  (Tr.  139.)  In July 2004, Dr. Kieffer determined it necessary that Plaintiff undergo repair of the left quadriceps muscle.  At that time, Dr. Kieffer noted that Plaintiff would need to follow up on his right quadriceps repair "for months" (Tr. 136), and indeed subsequently determined that the right muscle required revision surgery in light of an MRI which showed a re-tear of the muscle.  (Tr. 134.)  At the time of the hearing, Plaintiff had yet to undergo revision surgery.  Finally, in a memorandum dated August 19, 2004, presented to the ALJ subsequent to the hearing and included in the administrative record prior to decision, Dr. Kieffer wrote that Plaintiff was "100% restricted" from work activities.  (Tr. 159.)  The ALJ failed to acknowledge this memorandum in his opinion.  As such, at the time of his decision, the ALJ had before him evidence that Plaintiff's treating physician believed that Plaintiff was completely restricted from engaging in work activities; that Plaintiff had yet to undergo revision reconstructive surgery of the right quadriceps muscle for which primary surgery conducted thirteen months earlier had been unsuccessful; and that Plaintiff had not been discharged from treatment and was advised that he would be undergoing follow up

care "for months."  Despite this evidence, the ALJ found that Plaintiff would regain normal physical capacity with continued treatment, appearing to rely on Dr. Kieffer's surgical follow up notes that Plaintiff was progressing through therapy and was instructed to wean himself from assistive devices.  However, "doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to [his] work-related functional capacity."  <u>Hutsell</u>, 259 F.3d at 712.  In sum, there simply is no evidence in the record to support the ALJ's finding that Plaintiff retained the physical capacity to stand or walk up to six hours in an eight-hour workday and thus retained the ability to perform sedentary work.  <u>See</u> <u>Ellis v. Barnhart</u>, 392 F.3d 988, 999 (8th Cir. 2005) ("[T]he ability to do sedentary work is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.") (internal citation and quotation marks omitted).

"[I]t is incumbent upon the [Commissioner] to 'establish by medical evidence that the claimant has the requisite RFC'" to perform work.  <u>Vaughn v. Heckler</u>, 741 F.2d 177, 179 (8th Cir. 1984) (quoting <u>McCoy v. Schweiker</u>, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)).  "'[I]f a treating physician . . . has not issued an opinion which can be adequately related to the [Social Security Act's] disability standard, the ALJ is obligated . . . to address a precise inquiry to the physician so as to clarify the record.'"

Id. (quoting Lewis v. Schweiker, 720 F.2d 487, 489 (8th Cir. 1983)). While Dr. Kieffer opined in August 2004 that Plaintiff was 100% restricted in work activities, the undersigned notes that the issue as to whether a claimant is disabled for purposes of Social Security is one reserved to the Commissioner and is outside the province of medical sources. See Smallwood v. Chater, 65 F.3d 87, 89 (8th Cir. 1995); Nelson v. Sullivan, 946 F.2d 1314, 1316 (8th Cir. 1991). Nevertheless, in the absence of medical evidence demonstrating the extent to which Plaintiff may be limited in his ability to perform specific exertional work activities, such as standing, walking, sitting, alternating positions, crouching, kneeling, climbing, etc.; or for how long Plaintiff had been or is expected to be restricted by such limitations, the ALJ had a duty to fully and fairly develop the record by seeking an opinion from Plaintiff's treating physician as to how Plaintiff's impairments affect his ability to perform such specific functions in the workplace. See Nevland, 204 F.3d at 858; see also Lauer, 245 F.3d at 705-06. Despite the numerous treatment notes of Dr. Kieffer in this cause, no inquiry was made of this treating physician as to Plaintiff's ability to function in the workplace.

Accordingly, the ALJ's determination that Plaintiff retained the RFC to engage in a wide range of sedentary work is not supported by substantial evidence on the record as a whole. This cause should therefore be remanded to the Commissioner for a proper assessment of Plaintiff's functional limitations resulting from his

impairments, including obtaining information from Plaintiff's treating physician as to what level of work, if any, Plaintiff is able to perform. <u>Dixon v. Barnhart</u>, 324 F.3d 997, 1003 (8th Cir. 2003); <u>Nevland</u>, 204 F.3d at 858; <u>Vaughn</u>, 741 F.2d at 179.

## VI. Conclusion

For all of the foregoing reasons, the Commissioner's decision that Plaintiff was not under a disability at any time through the date of the final decision is not supported by substantial evidence on the record as a whole. Upon remand, the Commissioner should inquire of Plaintiff's treating physician as to Plaintiff's residual functional capacity to engage in work related activities, any specific limitations placed upon Plaintiff as a result of his leg injuries and treatment therefor, and the period(s) during which Plaintiff was so restricted by such limitations. In addition, any credibility determination regarding Plaintiff's subjective complaints should be accompanied by a specific and meaningful discussion of the factors set out in <u>Polaski</u> demonstrating that all evidence of record has been considered in such determination.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be reversed and that this cause be remanded to the Commissioner for further proceedings.

The parties are advised that any written objections to this Report and Recommendation shall be filed not later than **July 10, 2006**. Failure to timely file objections may result in waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).


_____
UNITED STATES MAGISTRATE JUDGE


Dated this _26th_ day of June, 2006.